OPINION OF THE COURT
Richard W. Wallach, J.
Motions Nos. 113, 114, and 171 on the Special Term Part I Calendar of December 27, 1985 are consolidated for disposition as follows:
Motions Nos. 113, by intervenors Corrigan, et al., and 171 by David Axelrod, M.D., as New York State Commissioner of *912 Health, and Robert Abrams, as Attorney-General of the State of New York, for leave to intervene in this action are granted without opposition. Separate orders granting this relief have been signed and entered.
Motion No. 114 by plaintiffs pursuant to specified sections of the Administrative Code of the City of New York to close the subject premises against any use and occupancy as a public nuisance so defined in Administrative Code § 564-15.0 and Penal Law § 240.45 is granted. Defendants’ cross motion to dismiss the complaint is denied.
THE AIDS HEALTH EMERGENCY
This action by the health authorities of the City of New York is taken against defendant the New St. Mark’s Baths (St. Mark’s) as a step to limit the spread of the disease known as AIDS (Acquired Immune Deficiency Syndrome). The parties are in agreement with respect to the deadly character of this disease and the dire threat that its spread, now in epidemic proportions, poses to the health and well-being of the community. Both sides cite as authoritative the publication AIDS, 100 Questions and Answers, issued by the New York State Department of Health which is concededly based on the latest and most authoritative scientific findings. Thus, there is no disagreement that the rate of incidence of new cases of AIDS in New York State is approaching 200 a month; effective treatment is wholly lacking, and approximately 50% of all persons diagnosed with AIDS have died. The death rate for this disease increases to nearly 85% two years after diagnosis. The same percentage of AIDS patients suffer from special forms of pneumonia or cancer which are untreatable, and about 30% of these patients show symptoms of brain disease or severe damage to the spinal cord.
Immediately relevant to this litigation are the scientific facts with respect to AIDS risk groups. During the five years in which the disease has been identified and studied, 73% of AIDS victims have consisted of sexually active homosexual and bisexual men with multiple partners. AIDS is not easily transmittable through casual body contact or transmission through air, water or food. Direct blood-to-blood or semen-to-blood contact is necessary to transmit the virus. Cases of AIDS among homosexual and bisexual males are associated with promiscuous sexual contact, anal intercourse and other sexual practices which may result in semen-to-blood or blood-to-blood contact.
*913 According to medical evidence submitted by defendants: "The riskiest conduct is thought to be that which allows the introduction of semen into the blood stream. Because anal intercourse may result in a tearing of internal tissues, that activity is considered high-risk for transmission.”
Fellatio is also a high risk activity. As stated by the organizer of the AIDS Institute of the New York State Department of Health: "Any direct contact with the semen of an infected person may increase the risk of AIDS transmission. The deposition of semen in areas likely to contain abrasions, open sores, and cuts and concurrent inflammatory processes which could result in the presence of susceptible lymphocytes increase the risk of AIDS transmission. Because the mouth represents such an area (the epithelial tissue in the mouth is more susceptible to injury than the epithelial tissue in the vagina), fellatio presents a high risk for the transmission of AIDS.”
PRIOR PROCEEDINGS
On October 25, 1985, the State Public Health Council, with the approval of the intervening New York State Commissioner of Health, adopted an emergency resolution adding a new regulation to the State Sanitary Code. This added regulation, State Sanitary Code (10 NYCRR) § 24.2, specifically authorized local officials, such as the City plaintiffs (City) here, to close any facilities "in which high risk sexual activity takes place.” More specifically, in 10 NYCRR 24-2.2, the regulation provided: "Prohibited Facilities: No establishment shall make facilities available for the purpose of sexual activities in which facilities high risk sexual activity takes place. Such facilities shall constitute a public nuisance dangerous to the public health.”
In 10 NYCRR 24-2.1, the regulation furnished definitions:
"a. 'Establishment’ shall mean any place in which entry, membership, goods or services are purchased.
"b. 'High Risk Sexual Activity’ shall mean anal intercourse and fellatio.”
The Public Health Council based this regulation on the Commissioner’s "findings” that: "Establishments including certain bars, clubs and bathhouses which are used as places for engaging in high risk sexual activities contribute to the propagation and spread of such AIDS-associated retro-viruses * * * Appropriate public health intervention to discontinue *914 such exposure at such establishments is essential to interrupting the epidemic among the people of the State of New York.”
Thereafter, on or about December 9, 1985, the City commenced this action by order to show cause for an injunction closing the New St. Mark’s Baths (St. Mark’s) as a public nuisance citing the health risks at St. Mark’s as defined in the State regulation. On December 19, 1985, following the issuance of a temporary restraining order defendants served papers in opposition to the City’s motion for a preliminary injunction and cross-moved to dismiss the complaint for failure to state a cause of action. Defendants challenged the State regulation on the grounds that it was an invasion of defendants’ patrons’ rights to privacy and freedom of association under the United States Constitution.
Also on December 19, 1985, Paul Corrigan, Charles Dempsey, John Doe and Tom Roe, sought an order to intervene as party defendants. The proposed intervenors-defendants (intervenors) are described as "frequent patrons of the New St. Mark’s Baths.” The interveners have also opposed the City’s motion for a preliminary injunction. Interveners also argue that the State regulation violates interveners’ rights to privacy and freedom of association.
On December 20, 1985, the Public Health Council promulgated 10 NYCRR 24-2.2 as a permanent regulation. The "findings” of the Public Health Council, as they relate to "high risk sexual activity”, were similar to the "findings” of the Council in October. The regulation was approved by the Commissioner of Health and became effective on December 23, 1985.
On December 24, 1985, the State Commissioner of Health and the Attorney-General moved to intervene as plaintiffs to defend the validity of the State regulation.
NATURE OF THE ACTION
This action is brought pursuant to the Nuisance Abatement Law. Under that law (Administrative Code § C16-2.0 et seq.), the City is empowered to enjoin public nuisances which are specified in section C16-2.2, including a building, erection, or place (other than certain one- or two-family dwellings) which is a nuisance as defined in Administrative Code §§ 564-15.0 and C16-2.2 (e), or a building wherein a criminal nuisance — as defined in Penal Law § 240.45 — is occurring. (Administrative *915 Code § C16-2.2 [l].) Under section 240.45 a person is guilty of a criminal nuisance when:
"1. By conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons; or
“2. He knowingly conducts or maintains any premises, place or resort where persons gather for purposes of engaging in unlawful conduct.”
Pursuant to Administrative Code § C16-2.5, an action such as this for an injunction to abate such public nuisances may be brought by the Corporation Counsel in the name of the City "[u]pon the direction of the mayor, or at the request of the head of a department or agency of the city, or at the request of a district attorney of any county within the city or upon his own initiative”.
Under Administrative Code § 564-15.0, a public nuisance is defined as follows: "§ 564-15.0 Definition of nuisance. — The word 'Nuisance’, shall be held to embrace public nuisance, as known at common law or in equity jurisprudence; whatever is dangerous to human life or detrimental to health; whatever building or erection, or part or cellar thereof, is overcrowded with occupants, or is not provided with adequate ingress and egress to and from the same or the apartments thereof, or is not sufficiently supported, ventilated, severed, drained, cleaned or lighted in reference to its intended or actual use; and whatever renders the air or human food or drink, unwholesome. All such nuisances are hereby declared illegal.”
CONSTITUTIONAL CONSIDERATIONS
The City has submitted ample supporting proof that high risk sexual activity has been taking place at St. Mark’s on a continuous and regular basis. Following numerous on-site visits by City inspectors, over 14 separate days, these investigators have submitted affidavits describing 49 acts of high risk sexual activity (consisting of 41 acts of fellatio involving 70 persons and 8 acts of anal intercourse involving 16 persons). This evidence of high risk sexual activity, all occurring either in public areas of St. Mark’s or in enclosed cubicles left visible to the observer without intrusion therein, demonstrates the inadequacy of self-regulatory procedures by the St. Mark’s attendant staff, and the futility of any less intrusive solution to the problem other than closure.
*916 With a demonstrated death rate from AIDS during the first six months of 1985 of 1,248 plaintiffs and the intervening State officers have demonstrated a compelling State interest in acting to preserve the health of the population (Jacobson v Massachusetts, 197 US 11, 25-27; Matter of Viemeister v White, 179 NY 235, 241; see, New York v United States, 326 US 572, 581; Crayton v Larabee, 220 NY 493, 501). Where such a compelling State interest is demonstrated even the constitutional rights of privacy and free association must give way provided, as here, it is also shown that the remedy adopted is the least intrusive reasonably available.
Furthermore, it is by no means clear that defendants’ rights will, in actuality, be adversely affected in a constitutionally recognized sense by closure of St. Mark’s. The privacy protection of sexual activity conducted in a private home (e.g., Griswold v Connecticut, 381 US 479; Stanley v Georgia, 394 US 557; accord, People v Onofre, 51 NY2d 476) does not extend to commercial establishments simply because they provide an opportunity for intimate behavior or sexual release (Paris Adult Theatre I v Slaton, 413 US 49; Matter of Dora P., 68 AD2d 719; Cherry v Koch, 129 Misc 2d 346; J.B.K., Inc. v Caron, 600 F2d 710, cert denied 444 US 1016; Pollard v Cockrell, 578 F2d 1002, 1005). As stated in Stratton v Drumm (445 F Supp 1305, 1309 [US Dist Ct, D Conn 1978]): "privacy and freedom of association * * * rights do not extend to commercial ventures.”
The private intervenors, of course, are not commercial venturers. However, the closure of this bath house does not extinguish their opportunities for unrestricted association in establishments which avoid creating a serious risk to the public health.
Also, State police power has been upheld over claims of 1st Amendment rights of association where the nature of the assemblage is not for the advancement of beliefs and ideas but predominantly either for entertainment or gratification (People v Morone, 150 Cal App 3d Supp 18, 198 Cal Rptr 316, 318, involving a heterosexual "swinging club”; Sunset Amusement Co. v Board of Police Commrs., 7 Cal 3d 64, 67, 496 P2d 840, 845-846, appeal dismissed 409 US 1121, involving a skating rink; Cornelius v Benevolent Protective Order of Elks, 382 F Supp 1182, 1195-1196, "the associational activities of the Elks and Moose are purely social and not political and therefore do not come within the core protection of the right to associate”). A tangential impact upon association or expression is insuffi *917 cient to obstruct the exercise of the State’s police power to protect public health and safety (Daly v Sprague, 742 F2d 896, 899; County of Sullivan v Filippo, 64 Misc 2d 533, 556-557; People v O’Sullivan, 96 Misc 2d 52, 53).
To be sure, defendants and the intervening patrons challenge the soundness of the scientific judgments upon which the Health Council regulation is based, citing, inter alia, the observation of the City’s former Commissioner of Health in a memorandum dated October 22, 1985 that "closure of bathhouses will contribute little if anything to the control of AIDS.” (For a vigorous medical opinion to the contrary from a specialist in this field see letter of Stephen S. Calazza, M.D., dated Jan. 24, 1985.) Defendants particularly assail the regulation’s inclusion of fellatio as a high risk sexual activity and argue that enforced use of prophylactic sheaths would be a more appropriate regulatory response. They go further and argue that facilities such as St. Mark’s, which attempts to educate its patrons with written materials, signed pledges, and posted notices as to the advisability of safe sexual practices, provide a positive force in combatting AIDS, and a valuable communication link between public health authorities and the homosexual community. While these arguments and proposals may have varying degrees of merit, they overlook a fundamental principle of applicable law: "It is not for the courts to determine which scientific view is correct in ruling upon whether the police power has been properly exercised. 'The judicial function is exhausted with the discovery that the relation between means and end is not wholly vain and fanciful, an illusory pretense’ (Williams v. Mayor of Baltimore, 289 U.S. 36, 42)” (Chiropractic Assn. v Hilleboe, 12 NY2d 109, 114). Justification for plaintiffs’ application here more than meets that test.
CROSS MOTION TO DISMISS THE COMPLAINT
Defendants and intervenors have mounted a three-pronged attack upon the causes of action contained in the complaint.
The first and second causes of action rest upon Nuisance Abatement Law § C16-2.2 (e) which defines as a nuisance "Any building, erection or place * * * which is a nuisance as defined in section 564-15.0 of this code”. (The referenced definitional section is set forth in full at p 915, supra.) Essentially defendants contend that the scope of this definition is limited to an offending building, and to the extent that the *918 City relies upon the second offending category, namely, "whatever is dangerous to human life or detrimental to health,” without linkage to such building conditions described immediately thereafter, the section is impermissibly vague. The broad legislative intent of the law requires rejection of this narrow and strained interpretation, nor is the language on its face too uncertain for enforcement.
The third and fourth causes of action rest on Nuisance Abatement Law § C16-2.2 (l) which defines as a nuisance "[a]ny building * * * wherein there is occurring a criminal nuisance as defined in section 240.45 of the penal law.” The record before the court demonstrates a prima facie case of violation by St. Mark’s of both subdivision (1) and subdivision (2) of Penal Law § 240.45. That a defendant may be criminally liable under subdivision (2) for acts of third parties (People v Schriber, 34 AD2d 852, affd 29 NY2d 780) does not mean that the same derivative liability may not be imposed for such conduct arising under subdivision (1), depending on the proofs adduced at trial. Viewed simply as a pleading where the facts alleged must be deemed true, the complaint here is immune from such attack. And for the purposes of supporting a preliminary injunction, there is ample proof that the St. Mark’s staff had actual knowledge of high risk sexual activity upon the premises and chose to condone it.
Defendants’ assault upon the fifth cause of action is based upon erroneous reliance upon Administrative Code § 564-1.0 and State Sanitary Code part 8 which empower the City Department of Health to abate nuisances by means of prescribed administrative proceedings, including specified notice followed by hearings at the administrative level. Defendants urge that these remedies preclude the alternative method of action adopted here. That argument is without merit, and overlooks the express provisions of Administrative Code § 564-1.0 which provides: "The department may institute and maintain all suits and proceedings which are reasonable, necessary and proper, to carry out the provision of the laws under which it acts.”
Clearly, plaintiff Department of Health had discretion to pursue the remedy of civil injunctive relief. Defendants have no valid due process objection, inasmuch as they have been afforded a complete right to be heard in the course of litigating this application.
Accordingly, defendants’ motion to dismiss the complaint is in all respects denied.
*919 CONCLUSION
For the foregoing reasons plaintiffs’ application for a preliminary injunctive relief is granted, and they are directed to settle a form of preliminary injunction on two days’ notice. The application by the intervening State officers for a declaration of validity of the State Council regulation is declined, since the request is not supported by any pleading, and the doctrine of stare decisis will suffice in this context.